**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| BOLAND MARINE & INDUSTRIAL, LLC, | § § § | |
| Plaintiff, | § | |
| v. | § § | No. 1:20-CV-66-LY-ML |
| BOUCHARD TRANSPORTATION CO., INC., | § § § | |
| Defendant, | § § | |
| WELLS FARGO BANK, N.A., | § | |
| Garnishee. | § | |

**REPORT AND RECOMMENDATION OF**
**THE UNITED STATES MAGISTRATE JUDGE**

TO THE HONORABLE LEE YEAKEL
UNITED STATES DISTRICT JUDGE:

Before the court is Defendant's Opposed Emergency Motion to Vacate January 23, 2020, Order of Attachment and Brief in Support. Dkt. #12.[1] After reviewing the pleadings, relevant case law, the entire case file, and holding the requisite Rule E(4)(f) hearing, the undersigned issues the following Report and Recommendation to the District Court.

**I.    BACKGROUND**

Boland Marine & Industrial, LLC ("Boland"), is a Louisiana limited liability company that provides "berthing/dockage, security, materials, equipment repairs and other related services . . . to Vessels [*sic*] while docked . . . in the Port of New Orleans." Dkt. #1 at 2. Bouchard Transportation Co., Inc. ("Bouchard") is a New York business that allegedly owns and operates

---

[1] The Opposed Emergency Motion to Vacate was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

several tugboats and barges in navigable waters across the United States. *Id.* Boland claims that it contractually agreed to provide berthing/dockage, security, labor, materials, equipment, repairs and other related services to several Bouchard vessels while docked in the Port of New Orleans. *Id.* Upon performing these services, Boland invoiced Bouchard for the owed amount of $1,452,150.00; it is undisputed the invoiced amount remains unpaid. *Id.* at 2.

On January 21, 2020, Boland filed this suit asserting a breach of contract claim and seeking to recover "the principal overdue amount of $1,452,150.00, interest at the rate of 1.5% per month, [and] all costs of the proceeds and reasonable attorneys' fees pursuant to the terms of [Boland's] invoices." *Id.* at 3. Boland also moved for a writ of maritime attachment and garnishment of Bouchard's property held or controlled by Wells Fargo (the bank-garnishee) as security. *Id.* at 4. Specifically, Boland sought to attach and garnish Bouchard's Wells Fargo bank account (the "Account") for the alleged amount owed. *Id.* Finding the requirements for a maritime writ of attachment and garnishment satisfied, on January 23, 2020, the District Court authorized process of attachment and ordered Boland to issue a writ of maritime attachment on the Account up to the amount sued upon in Boland's Complaint – $1,731,799.92. Dkt. #8 at 7.

Boland served the writ of attachment on a registered agent of Wells Fargo in Austin, TX. Dkt. #10; Dkt. #12. Consequently, Wells Fargo seized the funds from the Account and continues to garnish funds as they are deposited. Dkt. #12 at 3.

Bouchard has now filed the instant Opposed Emergency Motion to Vacate January 23, 2020, Order of Attachment and Brief in Support. *Id.* at 1. In its Motion, Bouchard argues the writ must be vacated because (1) Boland did not attach any property within this district; (2) the court does not have personal jurisdiction over Wells Fargo as garnishee; (3) Boland has no claim against Bouchard because Bouchard was acting as an agent for disclosed principals; and (4) Bouchard and

Boland orally settled the case and, accordingly, the case should be dismissed. *Id.* at 1-2. In accordance with the admiralty rules guiding this dispute – Supplemental Rule E of the Federal Rules of Civil Procedure – on February 4, 2020, the undersigned held the requisite Rule E(4)(f) hearing. Dkt. #19; *see* FED. R. CIV. P. SUPP. R. E(4)(f).

Since the Rule E(4)(f) hearing, Bouchard has filed two letter briefs that correct assertions made by the parties during the hearing, raise new arguments, and apprise the court of new facts. Dkt. #21, #24. Boland has filed letter briefs in response. Dkt. #24, #26.

## II.   APPLICABLE LAW

"Maritime attachment is a distinctive admiralty remedy that was a part of American jurisprudence at the time the Constitution was adopted." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 21:3 (6th ed. Nov. 2019). Codified in Supplemental Admiralty and Maritime Claims Rule B(1),[2] Rule B "allows a district court to take jurisdiction over a defendant in an admiralty or maritime action by attaching property of the defendant."[3] *Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.*, 817 F.3d 241, 244 (5th Cir. 2016) (quoting *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.*, 249 F.3d 413, 421 (5th Cir. 2001)). The dual purposes of this power are "to secure a respondent's appearance and to assure satisfaction in case the suit is successful." *Id.* (quoting *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950)). Once an attachment order has been issued, Rule E(4)(f) provides the procedure for a defendant or "any other person claiming an interest" to seek release from the

---

[2] "If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property – up to the amount sued for – in the hands of garnishees named in the process." FED. R. CIV. P. SUPP. R. B(1)(a).

[3] This is to say, "a Rule B attachment is a *quasi in rem* proceeding which permits the assertion of jurisdiction over a defendant's property located within the district even though the court has no *in personam* jurisdiction over the defendant." *Hays Tug & Launch Serv., Inc. v. Draw Events, LLC*, 364 F. Supp. 3d 365, 369 (D.N.J. 2019) (citing *W. Bulk Carriers, Pty. Ltd. v. P.S. Int'l, Ltd.*, 762 F. Supp. 1302, 1305 (S.D. Ohio 1991)).

attachment. FED. R. CIV. P. SUPP. R. E(4)(f).

Pursuant to Rule E(4)(f), once a defendant moves to vacate an attachment, "'a district court must [grant the motion] if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rule B and Rule E.'" *White Rosebay Shipping S.A. v. HNA Group Co.*, CA C-12-096, 2012 WL 6858239, at *9 (S.D. Tex. Dec. 5, 2012) (quoting *Naftomar Shipping & Trading Co. v. KMA Int'l S.A.*, CIV.A. V-11-2, 2011 WL 888951, at *1 (S.D. Tex. Mar. 10, 2011)); *see also* FED. R. CIV. P. SUPP. R. E(4)(f) ("Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules."). To support attachment of a defendant's "tangible or intangible personal property," a plaintiff must show that: "(1) [it] has a valid *prima facie* admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law [prohibiting] the attachment." *Naftomar Shipping & Trading Co.*, 2011 WL 888951, at *1 (citing *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006), *abrogated on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 61 (2d Cir. 2009))[4]; Schoenbaum, *supra*, at § 21:3.

## III.   ANALYSIS

As became apparent during the Rule E(4)(f) hearing on these issues, the parties' original

---

[4] The court, like many courts before it, "notes the Second Circuit decision in *Aqua Stoli* is not binding on this Court." *Anchor Marine Transp. Ltd. v. LONESTAR 203*, 2009 WL 783395, at *1 n.1 (W.D. La. Mar. 18, 2009); *see also Naftomar Shipping & Trading Co.*, 2011 WL 888951, at *2 n.1. Still, "the decision is notable for its tracing of the history of maritime attachments under Rule B. Furthermore, this Court notes the long history of maritime attachments in the courts of the Second Circuit due to the commercial importance of the ports of New York. Therefore, this Court finds the *Aqua Stoli* decision helpful to this Court's determination of the issues in this case." *Anchor Marine Transp. Ltd.*, 2011 WL 783395, at *1 n.1.

filings, for whatever reason, contain only abbreviated arguments. That is, the briefings on these issues contain only a fraction of the analysis conveyed to the court during the Rule E(4)(f) hearing. This is further apparent by the parties' desire to file two letter briefs further explaining their respective arguments. Although in this circumstance the undersigned would typically order the parties to file supplemental briefing, the court is cognizant of the time-sensitive nature of this emergency motion. Accordingly, no order for supplemental briefing was filed, and the court will address the parties' arguments in the order they were presented to the court. Specifically, the court will address whether the Account is within the district, whether it has personal jurisdiction over Wells Fargo as garnishee, whether Bouchard's auxiliary arguments warrant vacating the District Judge's Order, and whether the court should vacate the Order on equitable grounds.

## A.   Property Within the District

Initially, this case presents the question of whether the Account is "found within [this] district" for purposes of maritime attachment. Bouchard does not dispute that Boland's breach of contract claim is a *prima facie* admiralty claim, that Bouchard cannot be found within the Western District of Texas, or that there is no statutory or maritime law prohibiting the attachment. *See* Dkt. #12. Rather, Bouchard's terse Motion challenges only the third-prong necessary for maritime garnishment: that Bouchard's attached property – the Account[5] – is within the Western District of

_____

[5] It is undisputed that funds in bank accounts constitute "intangible personal property" subject to Rule B maritime attachment and garnishment. *See Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 259 n.9 (5th Cir. 2002) (describing bank accounts as a form of intangible property); *see also Jensen v. Rollinger*, SA:13-CV-1095-DAE, 2014 WL 4539660, at *2 (W.D. Tex. Sept. 11, 2014) (finding attachment and garnishment of the defendant's "retirement accounts" proper under Rule B); Schoenbaum, *supra*, at § 21:3 ("Maritime attachment is a distinctive admiralty remedy . . . . It is often used to attach money in bank accounts"). Moreover, the parties here do not dispute that the funds in the Wells Fargo bank account constitute "intangible property" subject to attachment. Accordingly, the central inquiries are whether the funds in Bouchard's Wells Fargo bank account were located in this district when attached and, if so, whether this court has personal jurisdiction over Wells Fargo as garnishee.

Texas. *Id.* at 1, 4.[6] Specifically, Bouchard argues the Account is not located in this district because it was opened in New York, not Texas. Dkt. #24 at 3.

In response, Boland argues the Wells Fargo bank account *is* within this district because Wells Fargo has numerous branches located in and around Austin and a bank account is located anywhere the account holder has access to it. Dkt. #16 at 4. Additionally, Boland appears to contend – relying on cases from this and other districts – that the Account is within this district because the court has personal jurisdiction over Wells Fargo. *Id.* at 4-6.

### 1.    *Analogous Case Law*

As a preliminary matter, the cases cited by Boland are inapplicable because they are not admiralty cases and, consequently, did not apply the Rule B analysis. Boland primarily relies on two non-admiralty cases for the proposition that, under Texas garnishment law, personal jurisdiction over the garnishee conveys jurisdiction over the attached property. Dkt. #16 at 5; *Af-Cap, Inc. v. Republic of Congo*, A-01-CA-100 SS, 2005 WL 6128154, at *3 (W.D. Tex. Feb. 4, 2005), *rev'd in part on other grounds*, 462 F.3d 417 (5th Cir. 2006); *Solgas Energy Ltd. v. Fed. Gov't of Nigeria*, MC H-09-368, 2010 WL 11679364, at *2 (S.D. Tex. Feb. 9, 2010), *adopted by*, 2010 WL 11679366 (S.D. Tex. Apr. 2, 2010). For example, in *Af-Cap, Inc.*, the court found that because it had personal jurisdiction over the garnishee, it could exercise *in rem* jurisdiction over the property that was to be garnished, regardless of the property's location. *Af-Cap, Inc.*, 2005 WL 6128154, *3. Similarly, the court in *Solgas Energy Ltd.* found that courts have *in rem* jurisdiction over funds in bank accounts, "regardless of the location of those assets," if the court has personal jurisdiction over the garnishee. *Solgas Energy Ltd.*, 2010 WL 11679364, at *5. These holding are

---

[6] Bouchard's Motion to Vacate is vague and, at best, abbreviated. *See* Dkt. #12. However, during the Rule E(4)(f) hearing, Bouchard's counsel attempted to articulate and expand upon Bouchard's arguments for why the Rule B attachment is improper. Dkt. #19.

inapplicable to a Rule B analysis because Rule B(1) specifically requires the property be found within the district.

Nonetheless, upon its own review of case law, the undersigned is cognizant that courts sitting in admiralty have applied a similar analysis in finding that attached properties – specifically, attached debts owed to the defendant by a third-party garnishee – are located within the district when the third-party garnishee is located within the district. *See PSARA Energy, LTD v. SPACE Shipping, LTD*, 290 F. Supp. 3d 158, 163 (D. Conn. 2017); *see also Day v. Temple Drilling Co.*, 613 F. Supp. 194, 196 (S.D. Miss. 1985). In *Day*, the parties disputed whether debt owed to the defendant by the garnishee was "located within the district" and, therefore, properly attached under Rule B(1). 613 F. Supp. at 196. Phrasing the dispute as whether the court had jurisdiction over the debt itself, the court concluded, "it appears that the Fifth Circuit would hold that in quasi in rem actions, if the court has jurisdiction over the garnishee-defendant, it has jurisdiction over the debt." *Id.* at 196-97. That is, the situs of a debt follows the debtor-garnishee so that jurisdiction over the garnishee-debtor grants jurisdiction over the debt. *Id.* Finding this analysis comports with the purpose of Rule B, the court determined that because it had personal jurisdiction over the debtor-garnishee, the debt was therefore properly within the district. *Id.* at 197.

Recently, the court in *PSARA Energy* similarly analyzed whether a debt owed by a garnishee was "within [the] Court's territorial reach" for purposes of Rule B. 290 F. Supp. 3d at 163. The court noted that "[t]he *situs* of intangible property has traditionally [been] seen as 'fictional,' but 'where the debtor and creditor are within the jurisdiction of a court, that court has constitutional power to deal with the debt." *Id.* (quoting *Standard Oil Co. v. New Jersey*, 341 U.S. 428, 438 (1951)). Accordingly, the court concluded that when a debtor-garnishee is subject to a court's *in personam* jurisdiction, the debts are deemed to have their situs within the court's district.

*Id.* at 164.

The court finds *Day* and *PSARA Energy* persuasive; their rationale permits courts, for purposes of Rule B, to determine the situs of intangible property where it is not otherwise readily apparent. Despite the merits of this rationale, however, this analysis has not been extended beyond intangible debts owed by a garnishee to a defendant. Nonetheless, "[i]t is well settled that a general deposit [account] . . . creates a debtor-creditor relationship between a bank and its customer." *Yazdchi v. Wells Fargo, N.A.*, CV H-15-568, 2017 WL 10153537, at *6 (S.D. Tex. Aug. 4, 2017) (citing *F.D.I.C. v. Lenk*, 361 S.W.3d 602, 606 (Tex. 2012)); *see Matter of Texas Mortg. Serv. Corp.*, 761 F.2d 1068, 1075 n.11 (5th Cir. 1985) ("Normally, funds deposited with a bank are general deposits which create a debtor-creditor relationship between the bank and its depositor."). Therefore, "[a] bank account is a debt that a bank owes to the depositor." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 283 (5th Cir. 1992). Here, the Account appears to be a general deposit account by which Bouchard is the depositor and Wells Fargo is the debtor. Thus, under *Day*'s and *PSARA Energy*'s rationale, bank accounts are within a court's district when the court has personal jurisdiction over the bank-garnishee.

Despite the above analysis, the parties have not presented – and the court has not identified – an admiralty case extending the analysis in *Day* and *PSARA Energy* to bank accounts. Furthermore, the court is cognizant of obvious distinctions between the debts depicted in *Day* and *PSARA Energy* and the bank account here. Debts, like those in *Day* and *PSARA Energy*, are entirely intangible and have no clear physical situs, thus requiring courts to devise a system to determine where debts are located. *See PSARA Energy*, 290 F. Supp. 3d at 163. To the contrary, bank accounts and the funds they contain historically had a physical situs, the location where the account was opened. However, in the age of modern banking, bank accounts have grown increasingly

fungible and intangible, and courts are split on where a bank account is located. Given this divergence and the absence of case law extending *Day*'s and *PSARA Energy*'s holdings to bank accounts, the undersigned must examine how to identify the location of bank accounts for purposes of Rule B.

### 2.    *Location of Bank Accounts*

As noted above, funds in bank accounts are intangible assets. Because the situs of intangible property is, in truth, a legal fiction, *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1122 (5th Cir. 1985), various courts have recognized that some intangible properties "may have more than one situs." *Acme Contracting, Ltd. v. Toltest, Inc.*, 07-10950, 2008 WL 4534175, at *6 (E.D. Mich. Oct. 3, 2008). In this vein, courts are split on whether bank accounts have a situs in only a single branch or in multiple branches. Unequivocally, this determination is made in deference to the laws of the forum state.[7] While this narrow issue appears to be an issue of first impression in this circuit, other courts' decisions are instructive in determining where bank accounts are located.

The Second Circuit, guided in part by New York law dating back to at least 1930,[8] follows the "separate entity rule," which dictates that "each branch of a bank [be] treated as a separate entity for attachment purposes." *Allied Mar., Inc. v. Descatrade SA*, 620 F.3d 70, 74 (2d Cir. 2010) (quoting *Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50, 52 (2d Cir.

---

[7] "Under Rule B(1), the situs of a debt is determined according to federal law. As a matter of federal law, however, we defer to the law of the forum state on this question." *Eng'g Equip. Co. v. S.S. Selene*, 446 F. Supp. 706, 709 (S.D.N.Y. 1978) (citing *Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50, 52 (2d Cir. 1965)); *see also Shinto Shipping Co. v. Fibrex & Shipping Co.*, 425 F. Supp. 1088, 1091 (N. D. Cal. 1976). A survey of case law reveals the majority of states do not have laws on this subject, thus requiring courts to examine comity and logic to predict what the state high court would likely decide. *See e.g.*, *Marisco, Ltd.*, 889 F. Supp. at 1250 ("Insofar as the Hawai'i Supreme Court has never addressed whether to adopt the separate entity rule, this Court's task is to predict how the supreme court would decide the issue."). Because Texas has no direct authority, the undersigned must do the same.

[8] When there is no federal maritime law to guide a decision, courts generally look to state law to determine property rights. *Shipping Corp. of India*, 585 F.3d at 70 (citing *California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 283 (1982) (considering state law where federal admiralty law is "thin" and "a decision ... contrary to the general rule of the state might have disruptive consequences for the state banking system")).

1965)). As a result, "the debt owed by a branch finds its situs within the territorial jurisdiction of [that] branch." *Id.* Accordingly, under the "separate entity rule," a bank account has only one location – the branch, or the main office, supposedly holding the funds for the account owner. In other words, "the mere fact that a bank may have a branch within New York is insufficient to render accounts outside of New York subject to attachment" by a court sitting in New York. *Id.* (quoting *John Wiley & Sons, Inc. v. Kirtsaeng*, No. 08 Civ. 7834, 2009 WL 3003242, at *3 (S.D.N.Y. Sept. 15, 2009)).

Clearly articulating the theory of this rule, the court in *Bluebird Undergarments Corp.* stated:

> A branch bank is a separate and distinct business entity . . . . Not only are branch banks separate entities, but deposits made in a branch bank are payable there and there only . . . . A branch bank being separately indebted to its depositor, the existing obligation lies primarily between such branch bank and its depositor. The conclusion follows as a necessary corollary that the debt owed by a branch finds its situs within the territorial jurisdiction of such branch.

*Bluebird Undergarment Corp. v. Gomez*, 249 N.Y.S. 319 (N.Y. City Ct. 1931); *see also Sabre Shipping Corp.*, 341 F.2d at 53 (quoting the language in *Bluebird Undergarment Corp.*). Furthermore, as enunciated by the Second Circuit, *Cronan v. Schilling* describes the rationale behind this theory:

> Unless each branch of a bank is treated as a separate entity for attachment purposes, no branch could safely pay a check drawn by its depositor without checking with all other branches and the main office to make sure that no warrant of attachment had been served upon any of them. Each time a warrant of attachment is served upon one branch, every other branch and the main office would have to be notified. This would place an intolerable burden upon banking and commerce, particularly where the branches are numerous, as is often the case.

*Sabre Shipping Corp.*, 341 F.2d at 53 (quoting *Cronan v. Schilling*, 100 N.Y.S.2d 474, 475 (Sup. Ct. 1950)). As demonstrated by *Bluebird Undergarment* and *Cronan*, the rationale for the separate entity rule predates modern, online banking.

Despite the Second Circuit's continued application of the separate entity rule, a growing number of other courts appear to be rejecting the rule as outdated and instead finding that a bank account is located anywhere the account holder has access to it. *See* Spero, *Asset Protection: Legal Planning, Strategies and Forms* ¶ 7.03(1)(a) (2019) ("Most states that have considered the issue have rejected the separate entity rule"). For example, in rejecting the separate entity rule, the court in *Acme Contracting, Ltd v. Tolest, Inc.*, opined that "[t]he purpose behind the rather ancient rule" is outdated because today, "banks use highspeed computers with central indexing capabilities to keep track of accounts which, along with other sophisticated communications equipment, enable a bank with multiple branches to easily monitor checking accounts from the main branch." No. 07-10950, 2008 WL 4534175, at *6 (E.D. Mich. Oct. 3, 2008). The court further noted that given the defendant's "right to draw on its account at any of the numerous [bank] branches," "[a]s a practical matter, the funds in [the defendant's] account are 'located' wherever they are available for withdrawal by the defendant." *Id.* at *7; *see also Regions Equip. Fin. Corp. v. Blue Tee Corp.*, 313 F.R.D. 568, 571 (E.D. Mo. 2016) (following *Acme Contracting* and finding that the funds held in the defendant's bank account were so "fungible, intangible" that the bank "was able to seamlessly freeze  [the assets] . . . everywhere immediately after it was served with the writ at" a single branch location); *Marisco, Ltd. v. Am. Samoa Gov't*, 889 F. Supp. 2d 1244, 1250 (D. Haw. 2012) (predicting the Hawai'i Supreme Court would reject the separate entity rule "as being 'a somewhat dated and seldom-cited legal doctrine'") (quoting *Tribie v. United Dev. Grp. Int'l LLC*, No. 07–22135–CIV, 2008 WL 5120769, at *3 (S.D. Fla. Dec. 2, 2008)).

In light of the foregoing, the basis and rationale of the separate entities rule appears to be based on an antiquated view of the banking system that predates modern computerized banking. As demonstrated here, Wells Fargo had no trouble freezing Bouchard's Account everywhere

despite only being served in Austin. Similarly, Bouchard does not dispute that even if the Account was opened in New York, it had immediate access to its funds at any Wells Fargo branch. This is because modern banking has rendered Bouchard's funds entirely intangible; rather than sitting in Wells Fargo's New York vault, the intangible funds exist in a series of computerized sequences and in Wells Fargo's promise to pay Bouchard when and where Bouchard asks for payment. Accordingly, the court is persuaded by the rationale in *Acme Contracting* that accounts are "located" wherever they are available for withdrawal by the depositor. Given the above and because there is no Texas law directly on the subject, the court is persuaded that the Texas Supreme Court would reject the separate entity rule and find that bank accounts are located wherever funds are available to the account holder.

Here, it is undisputed that Wells Fargo has "multiple Wells Fargo branches in Austin and the immediate surrounding area." Dkt. #16 at 4. Thus, Bouchard had access to the Account's funds in Austin just as it did in New York. Accordingly, Bouchard's intangible property – the Account – is found within the Western District of Texas.

3. *Purpose of Rule B(1)*

The court notes the above finding is consistent with the purpose of attachment under Rule B. Much has been written about the long and storied history of maritime attachment. *See, e.g.,* Cheryl A. Morris, *Maritime Seizures: Not Just Ships-Maritime Seizures of Cargo, Freight, Fuel and Other Tangible and Intangible Items*, 19 U.S.F. MAR. L.J. 69 (2007). Therefore, "[r]ather than embark upon a protracted analytical voyage through the history of maritime attachment as many [courts have done], the [c]ourt notes that in *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne*, 605 F.2d 648 (2d Cir. 1979), the [Second Circuit] succinctly summarized both the tradition and uniqueness of attachment in the admiralty setting," stating:

> Because the perpetrators of maritime injury are likely to be peripatetic, *Ex Parte Louisville Underwriters*, 134 U.S. 488, 493 (1890), and since the constitutional power of the federal courts is separately derived in admiralty, U.S. Constitution Art. III § 2, suits under admiralty jurisdiction involve separate policies to some extent. This tradition suggests not only that jurisdiction by attachment of property should be accorded special deference in the admiralty context, but also that maritime actors must reasonably expect to be sued where their property may be found.

*Parcel Tankers, Inc. v. Formosa Plastics Corp.*, 569 F. Supp. 1459, 1462 (S.D. Tex. 1983) (quoting *Amoco Overseas Oil Co.*, 605 F.2d at 655)). The United States Supreme Court has explained that admiralty attachment "has two purposes: to secure a respondent's appearance and to assure satisfaction in case the suit is successful." *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950). Moreover, now that admiralty attachment has been codified in Rule B which expands the property that may be subject to attachment, *Aqua Stoli*, 460 F.3d at 437, "the use of Supplemental Rule B [] is 'to permit the attachment of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy a judgment.'" *Jensen v. Rollinger*, SA:13-CV-1095-DAE, 2014 WL 4539660, at *8 (W.D. Tex. Sept. 11, 2014) (quoting *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013)).

The purpose and expansion of admiralty attachment indicates a broad intent to allow plaintiffs proceeding in admiralty to secure satisfaction of their case. *See* 7A JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 90 (3d ed. 1997).[9] Without questioning the justification for extending Rule B attachment from vessels to intangible bank accounts,[10] providing litigants with

---

[9] "[B]y preserving maritime attachment and garnishment, a claimant is enabled to obtain jurisdiction over credits and effects of the defendant in any number of places where these may be attacked or garnished, although the defendant's residence or place of business may be half-way around the world and the occurrence underlying the suit took place in some other district, or the high seas, or in a foreign country. The practical importance to plaintiffs in preserving this remedy, which antedates the formulation of a comparable common law remedy, is readily apparent." *Id.*

[10] The court is aware that its analysis finds jurisdiction anywhere a bank has a branch. While Rule B broadly applies to "tangible and intangible property," the court questions whether the Rule's authors foresaw the breadth and

a means of ensuring satisfaction in their admiralty suit by attaching bank accounts – intangible property that can be secured without "requir[ing] the plaintiff to scour the globe" – appears to be in accordance with the purpose of Rule B.

### B.   Personal Jurisdiction over Wells Fargo as Garnishee

Bouchard contends that even if Boland attached property within the district, "[t]his court does not have personal jurisdiction over the [Garnishee] which invalidates the attachment." Dkt. #12 at 1.

"Maritime attachment serves both to obtain jurisdiction over a defendant through [its] property and to assure satisfaction of the claim." Schoenbaum, *supra*, at § 21:3. "Although personal jurisdiction is not necessary against the defendant, personal jurisdiction over the third person garnishee is an essential prerequisite." *Id.* (citing *PSARA Energy Ltd.*, 290 F. Supp. 3d at 165). If there is no personal jurisdiction over the garnishee, the attachment must be vacated. *Id.* (citing *PSARA Energy Ltd.*, 290 F. Supp. 3d at 165). Thus, in a Rule B analysis, the personal jurisdiction inquiry is uniquely centered on the garnishee, not the defendant.

The same personal jurisdiction requirements for civil defendants apply to nonresident garnishees. *See FG Hemisphere Associates LLC v. Republique Du Congo*, CIV. A. H-02-4261, 2006 WL 870486, at *1 (S.D. Tex. Apr. 5, 2006). A federal court may exercise personal jurisdiction over a nonresident defendant if: (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) the exercise of such jurisdiction comports with due process under the Constitution. *See Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999). Texas's long-arm statute extends to the limits of federal due process, which permits the exercise of specific jurisdiction, a form of personal jurisdiction, over a non-resident defendant

_____

fungible nature of intangible property today. Nonetheless, this court's conclusion is consistent with current law, modern banking, and the two-pronged purpose of Rule B.

where (1) the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) the exercise of personal jurisdiction is fair and reasonable. *Monkton Ins. Servs. v. Ritter*, 768 F.3d 429, 433 (5th Cir. 2014) (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)).

Applying the above factors, the court finds it has specific jurisdiction over Wells Fargo as garnishee. First, Wells Fargo purposefully availed itself of the privilege of conducting activity in this district when it established numerous branches within the district. Second, Boland's writ of attachment and the corresponding motion to vacate arise out of Wells Fargo's contacts with this forum –Wells Fargo maintained Bouchard's Account in Austin, Texas, because, as explained above, bank accounts are located for purposes of Rule B wherever the account holder has access to it. Third, it is reasonable and fair to exert personal jurisdiction over Wells Fargo given its expansive operations in this district. Accordingly, this court finds that it has personal jurisdiction over Wells Fargo as garnishee for the purposes of this action.[11]

In light of the above, the undersigned finds Boland has satisfied its burden of showing it has met the requirements of Rule B(1) and Rule E(4)(f). Furthermore, this court has the authority to uphold the attachment because it has personal jurisdiction over Wells Fargo. Accordingly, unless Bouchard is successful on one of its auxiliary or equitable arguments, the District Court's Order should not be vacated.

---

[11] The court notes that the presence of attached property in Texas might alone provide a sufficient basis for the exercise of jurisdiction over Wells Fargo. *See Licea v. Curacao Drydock Co., Inc.*, 627 F. App'x 343, 350 (5th Cir. 2015) (citing *Shaffer v. Heitner*, 433 U.S. 186, 207 (1977) ("[P]resence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation.")). Given the recent developments in personal jurisdiction law, however, the undersigned does not find these cases to be binding authority. *See Daimler AG v. Bauman*, 571 U.S. 117 (2014); *see also BNSF Ry. V. Tyrrell*, 137 S. Ct. 1549 (2017).

### C.      Auxiliary Claims

In a short, 51-word paragraph, Bouchard argues Boland has no claim against Bouchard because "Bouchard was acting as an agent for disclosed principals" and, accordingly, Boland contracted with the owning vessel's companies, not Bouchard. Dkt. #12 at 5. In response, Boland contends that "Bouchard always has owed the debts Boland's verified complaint confirms, as principal." Dkt. #16 at 7. In support, Boland asserts: (1) that payment always came from Bouchard's account, Dkt. #16-4 at 1-2 (Affidavit of Walter Haley, Boland's Vice President); (2) Boland's invoices were only issued to individual companies because "an ex-Bouchard employee named John Shaw . . . asked that the invoices be so issued, for accounting purposes," Dkt. #16 at 7[12]; and (3) Bouchard's own website and prior court cases confirm that Bouchard is the owner and operator of the vessels repaired by Boland, Dkt. #16-8.

During the Rule E(4)(f) hearing, Defendant Bouchard called Mr. Morton Bouchard, the President and CEO of Defendant Bouchard, as a fact witness on whether Defendant Bouchard was acting as an agent for disclosed principals. Dkt. #25 at 29. However, because Rule E(4)(f) hearings are not for purposes of "mak[ing] binding determinations of fact," but rather are for "merely holding that it is likely that alleged facts are true," *Naftomar Shipping & Trading Co.*, 2011 WL 888951, *3, the court will not decide today whether Bouchard was, in fact, acting as an agent for disclosed principals. *See Jensen*, 2014 WL 4539660, at *3 n.1; *see also Vinmar Int'l Ltd. v. M/T Clipper MAKISHIO*, No. H–09–3829, 2009 WL 6567104, at *1 (S.D. Tex. Dec. 9, 2009) ("[The Rule E] procedure 'is not intended to resolve definitely the dispute between the parties, but only

---

[12] During the hearing, Mr. Haley testified the "Bouchard company [generally] always paid Boland." Dkt. #25 at 44. When asked to elaborate on Bouchard and Boland's relationship, Mr. Haley testified that "[a]s of four years ago, we would invoice Bouchard Transportation. But I received a phone call from the maintenance manager at the time, Mr. John Shaw, and [he] said: Due to your accounting procedures, [Boland was] to invoice individual companies as far as the vessel and the barge and the tug." *Id.* Mr. Haley then testified this change was "[f]or accounting reasons only," and that "before and since . . . all payments from Bouchard [came] from the Bouchard general account." *Id.*

to make a preliminary determination whether there were reasonable grounds for issuing the [writ of attachment].'") (quoting *Salazar v. Atlantic Sun*, 881 F.2d 73, 79 (3d Cir. 1989)). As a preliminary determination, the undersigned is persuaded by Boland that Bouchard was the principal and, therefore, finds there were reasonable grounds for issuing the writ of attachment.[13]

### D.   Equitable Vacatur

#### 1.   *Bouchard's First Letter Brief*

In its first letter brief,[14] Bouchard appears to correct a mistaken assertion it made during the Rule E(4)(f) and, in doing so, advocate for the implementation of equitable vacatur. When asked during the Rule E(4)(f) hearing whether the principle of equitable vacatur applies in this case, Bouchard's counsel asserted that equitable vacatur "occurs with adjoining districts," but this so-called "adjoining district rule" was not satisfied here. Dkt. #25 at 13-14 (Transcript). However, Bouchard's letter brief argues the concept of equitable vacatur "is broader than the 'adjoining district rule.'" Dkt. #21-1 (First Letter Brief). Bouchard contends that "[i]f the plaintiff and defendant are both present in the same district and would be subject to jurisdiction there, but the plaintiff goes to another district to attach the defendant's assets'[*sic*], vacatur is required." *Id.* at 21-1 (citing *Aqua Stoli*, 460 F.3d at 445-446).   Here, Bouchard claims that because Boland's principal place of business is in New Orleans, Bouchard is "subject to personal jurisdiction in

---

[13] Bouchard similarly argues in a short paragraph that authorized officials of both companies orally settled the case. The only evidence Bouchard presents of this settlement is the testimony and declaration of Mr. Bouchard. Dkt. #12 at 5; Dkt. #25 at 36. Boland vehemently disputes that any settlement was made and Mr. Haley, Boland's Vice President of Operations, testified no such settlement was made. Dkt. #25 at 43-44. Regardless of whether settlement contracts need to be in writing under admiralty law, the court is not persuaded by Bouchard's limited evidence that such a settlement occurred. Therefore, for the same reasons depicted above, the undersigned finds, at this juncture, that Bouchard and Boland have *not* settled this case.

[14] This court neither invited, solicited, nor gave parties permission to file additional briefing regarding Bouchard's Motion to Vacate. Furthermore, the parties failed to seek leave from the court to file additional briefing. This is problematic, as Local Rule CV-7(f) clearly states that absent leave of court, no further submissions on a motion are allowed after a timely filed reply. Accordingly, Bouchard's two letter briefs are improperly filed. Nonetheless, given Bouchard's terse Motion to Vacate, the undersigned will review and adjudicate the arguments raised in the two letter briefs.

Louisiana," and this suit arises out of services rendered in New Orleans, equitable vacatur demands this court vacate the District Court's Order. *Id.*[15]

"In addition to its authority to vacate an attachment due to a plaintiff's failure to satisfy the requirements of Supplemental Rules B and E, a district court also has equitable discretion to vacate an attachment." *Knox v. Hornbeck Offshore Serv., LLC*, 3:19-CV-00181, 2019 WL 3202296, at *2 (S.D. Tex. July 16, 2019) (citing *Aqua Stoli*, 460 F.3d at 445). While neither the Supreme Court nor the Fifth Circuit have affirmed or defined the district court's equitable vacatur power, the Second Circuit has held "a district [court] may vacate the attachment if the defendant shows at the Rule E hearing that (1) the defendant is subject to suit in a convenient adjacent jurisdiction; (2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or (3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." *Aqua Stoli*, 460 F.3d at 445.[16]

The Fourth and Ninth Circuits have both cited with approval the equitable vacatur test announced in *Aqua Stoli*, and the Eleventh Circuit has affirmed a district court's vacatur of an attachment based on "an equitable exception to the general rule upholding maritime attachments." *See Vitol*, 708 F.3d at 537 (quoting *Aqua Stoli*, 460 F.3d at 447); *ProShipLine Inc. v. Aspen Infrastructures Ltd.*, 609 F.3d 960, 969 (9th Cir. 2010) ("we agree with and adopt the contours of equitable vacatur laid out by the Second Circuit"); *McDermott Gulf Operating Co. v. Con-Dive, LLC*, 371 F. App'x 67, 70 (11th Cir. 2010) (citing *Aqua Stoli*, 460 F.3d at 444–45). Although the Fifth Circuit has not yet adopted the equitable vacatur test, district courts in the Fifth Circuit have done so. *See Knox*, 2019 WL 3202296, at *3 ("the Court adopts the equitable vacatur test

---

[15] Bouchard's equitable vacatur argument is not briefed in its Motion to Vacate.
[16] The court in *Aqua Stoli* further cautioned that such equitable vacatur may be applied only "in certain limited circumstances." *Id*. at 444.

announced in *Aqua Stoli*"); *see also Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A.,* CIV.A. G-12-304, 2013 WL 126534, at *3 (S.D. Tex. Jan. 9, 2013), *adopted,* 3:12-CV-304, 2013 WL 4505987 (S.D. Tex. Aug. 22, 2013), *aff'd,* 817 F.3d 241 (5th Cir. 2016). In light of the foregoing persuasive authority, the court adopts *Aqua Stoli*'s equitable vacatur test.

Notably, equitable vacatur is not required even if the defendant shows at a Rule E hearing that one of the limited grounds for equitable vacatur is present; rather, the court in its discretion must still determine whether equity weighs in favor of vacating the attachment. *See Aqua Stoli*, 460 F.3d at 445 (stating "a district court *must* vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rule B," but "*may* vacate the attachment if the defendant shows at the Rule E hearing that" one of the "certain limited circumstances" for equitable vacatur is met) (emphasis added); *Knox*, 2019 WL 3202296, *2 ("a district court also has equitable discretion to vacate an attachment"); *Hyundai Merch. Marine Co. v. Oceanic Petroleum Source Pte Ltd.*, 656 F. Supp. 2d 416, 420 (S.D.N.Y. 2009) (similarly finding "the balance of the equities weighs against vacatur" despite the fact that "one of the limited grounds for vacatur enumerated in *Aqua Stoli* [was] present").

Upon review, the principles of equity in this case do not favor the application of equitable vacatur. First, the court in *Aqua Stoli* – the very case relied upon by Bouchard – clearly states that a district court may equitably vacate an attachment "if the defendant shows *at the Rule E hearing*" that equitable vacatur is warranted. *Aqua Stoli*, 460 F.3d at 445 (emphasis added); *see* Dkt. #21-1. Here, Bouchard waived its equitable vacatur argument during the Rule E hearing, and, in any case, did not sufficiently show that equitable vacatur should apply during either the Rule E hearing or its Motion to Vacate. *See* Dkt. #12, #25.

Second, because Bouchard appears at this preliminary stage of the proceedings to be deeply

insolvent, the balance of equities weighs against equitable vacatur. As noted above, courts have repeatedly recognized that maritime attachment serves two objectives: to obtain jurisdiction over the defendant and to assure satisfaction of any judgment in favor of the party bringing the action. *See Jackson v. Inland Oil & Transp. Co.*, 318 F.2d 802, 806 (5th Cir. 1963). Regarding this second purpose, "courts have also held that the spirit of Rule B 'is not violated when a party's primary interest in seeking the attachment is obtaining security to satisfy a judgment, rather than simply obtaining *in personam* jurisdiction.'" *W. Bulk Carriers (Australia), Pty. Ltd. v. P.S. Int'l*, 762 F. Supp. 1302, 1306 (S.D. Ohio 1991) (quoting *Staronset Shipping Ltd. v. North Star Navigation Inc.*, 659 F. Supp. 189, 191 (S.D.N.Y. 1987)); *see also Furness Withy (Chartering) Inc., Panama v. World Energy Sys. Assocs., Inc.*, 523 F. Supp. 510 (N.D. Ga. 1981); *Norfolk Shipbuilding & Drydock Corp. v. The Motor Yacht LaBelle Simone*, 371 F. Supp. 985 (D.P.R. 1973).

Here, Boland alleges that Bouchard owes it over $1.4 million in the underlying action. Dkt. #22-1. It similarly appears undisputed that Bouchard faces a plethora of lawsuits around the U.S. for collective damages of over $12 million dollars. *Id.* at 1 (listing litigation); *see e.g.*, *Ryan Marine Serv., Inc. v. M/V Donna Bouchard et al.*, No. 3:20-cv-00034 (S.D. TX. Feb. 5, 2020). Moreover, Boland has demonstrated that United States Marshals have seized, to date, twelve of Bouchard's alleged vessels in recently filed federal actions, and Bouchard has not posted security for their release. *Id.* at 3. It also appears that Bouchard has failed to pay its employees since at least January 1, 2020, giving rise to a class action wages claim currently pending in the Southern District of New York. *Id.* at 4-5; Dkt. #26-2 at 8, 9. At least in part because of the foregoing financial trouble, the U.S. Coast Guard has determined the operational condition of Bouchard's alleged vessels "poses a risk to the safety of New York and New Jersey waterways" and ordered these vessels to be "moved out of anchorage and moored at a safe berth." Dkt. #26-2 at 12-13; Dkt. #12 at 28-29 ("this

office has received multiple reports of Bouchard crew members not receiving compensation for earned wages which has resulted in notifications of crewmembers threatening to walk off Bouchard vessels"). Given the above, the court finds Bouchard is insolvent and, accordingly, there is a very real possibility that, without an attachment, any judgment on the merits procured by Boland may go unsatisfied. Because securing the satisfaction of a judgment is one of the fundamental purposes of Rule B attachments, equity strongly opposes vacating Boland's maritime attachment.

### 2.    Bouchard's Second Letter Brief

In its second letter brief, Bouchard again asserts a number of arguments that relate to equitable vacatur. Among these arguments – many of which have been addressed above – Bouchard informs the court that Boland has "intervened with claims against [Bouchard] in two lawsuits in the U.S. District Court for the Eastern District of Louisiana," and in both cases "Boland sues Bouchard *in personam* but also claims the right to obtain a Rule B attachment on" two of Bouchard's vessels.[17] Dkt. #24 at 1-2. Bouchard argues (1) the lawsuit in the Eastern District moots the need for an attachment in the Western District as Boland has sought security through attachment in the Eastern District to satisfy any judgment it obtains, and (2) equity demands vacating the attachment because, unlike the Eastern District of Louisiana, the Western District of Texas has no connection with this suit.

In response, Boland argues it still requires security on its maritime claim against Bouchard because "the maritime liens *in rem* only partially secure Boland." Dkt. #26-1. Boland asserts that out of the ten vessels it serviced, six of them are encumbered by a prior-recorded preferred ship

---

[17] The court notes it is unclear based on the Bouchard's letter brief whether Boland's subsequent "attachment" of two vessels in the Eastern District of Louisiana was an attachment under Rule B or an *in rem* arrest of a vessel pursuant to Rule C. Nonetheless, this does not affect this court's analysis.

mortgage of $165,000,000.00. *Id.* ("33% of what Bouchard owes Boland is for Boland's work on vessels encumbered by Wells Fargo's priming First Preferred Ship's Mortgage"). Furthermore, Boland claims Bouchard's unpaid vessel crews and the U.S. Coast Guard also have priming maritime liens. *Id.* Because of the ship mortgages and the numerous priming maritime liens, Boland contends it is uncertain whether its subsequent maritime liens in the Eastern District of Louisiana action sufficiently secure satisfaction on a potential judgment.

In light of the above and considering Bouchard's limited briefing, the court is not persuaded that Boland's subsequent maritime liens moot the need for an attachment in the Western District of Texas. To the contrary, it appears that Boland is not secured on its maritime liens alone given the interests other parties have on Bouchard's property. Therefore, the Eastern District of Louisiana cases cited by Bouchard do not affect this court's equity analysis.

Moving to Bouchard's second contention, the court is sympathetic to Bouchard's argument that Boland's suit is more appropriately brought in the Eastern District of Louisiana. The events underlying this litigation occurred in the Eastern District of Louisiana, and both parties appear to have a substantial presence within that district. Furthermore, this case admittedly only has a tangential relationship with the Western District of Texas and is only properly brought here pursuant to Rule B. Nonetheless, as noted above, the elements of Rule B are met[18] and Bouchard failed to sufficiently show in its Motion to Vacate, or argue during the Rule E(4)(f) hearing, that equitable vacatur should apply. Moreover, the purpose of Rule B appears to be furthered in this case, as Boland's aggressive use of Rule B has allowed it to secure the satisfaction of a judgment to the heights of what admiralty law will allow. Thus, considering all the factors in this case, the balance of equities favors denying equitable vacatur.

---

[18] Furthermore, as noted during the hearing, this Rule B attachment action could not be brought in the Eastern District of Louisiana as Wells Fargo has no presence within that district.

Notwithstanding the above, the undersigned is cognizant of the wide-reaching implications this decision may have and that, in other cases, equitable vacatur may serve as a safeguard to prevent crafty plaintiffs from forum shopping or choosing a forum to inconvenience defendants. However, in this case, Bouchard failed to demonstrate the District Court's Order should be equitably vacated. Accordingly, Bouchard's Opposed Emergency Motion to Vacate January 23, 2020, Order of Attachment and Brief in Support should be **DENIED**.

## IV.   RECOMMENDATION

For the reasons given above, the undersigned **RECOMMENDS** that Defendant's Opposed Emergency Motion to Vacate January 23, 2020, Order of Attachment and Brief in Support (Dkt. #12) be **DENIED**.

## V.   OBJECTIONS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985);

*Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

SIGNED February 28, 2020.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE